**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| RL INVESTOR HOLDINGS, LLC<br><br>Plaintiff,<br><br>v.<br><br>ALEX LAMB, and 74 Additional Clients of Bryson Harris Suciu & DeMay PLLC<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff RL Investor Holdings, LLC ("Red Lobster") files this complaint against 75 individuals ( "Claimants"): (1) who are represented by Bryson Harris Suciu & DeMay, PLLC ("Claimants' Counsel"); (2) who claim to have visited Red Lobster's website (the "Website"); and (3) who collectively filed 75 identical arbitration demands (the "Arbitration Demands") alleging they did not consent to Red Lobster's use of certain tracking technologies on the Website. Claimants allege violations of the Electronic Communications Privacy Act ("ECPA") and California Invasion of Privacy Act ("CIPA"). Claimants demand arbitration pursuant to the arbitration agreement in the Terms and Conditions on the Website (the "Arbitration Agreement"). That Arbitration Agreement states that "disputes will be arbitrated only on an individual basis and will not be joined or consolidated with any other arbitrations or other proceedings that involve any claim or controversy of any other party." The Arbitration Agreement also states that Red Lobster has the right to decline arbitration of any claim if it is required to pay a greater share of the arbitration fees.

Red Lobster seeks an order from the Court declaring that: the Claimants' mass arbitration tactic is not permitted by the Arbitration Agreement; that even if mass arbitration was permitted, Red Lobster has the right to decline arbitration and defend the claims in court, and enjoining Claimants from further trying to compel their claims to arbitration.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this declaratory judgment action because it involves the enforceability of an arbitration agreement in connection with claims arising under federal law. *See Postmates Inc. v. 10,356 Individuals*, No. 20-cv-2783, 2020 U.S. Dist. LEXIS 70210, at *15 (C.D. Cal. Apr. 15, 2020) (federal courts can review arbitration agreements "in a controversy where the court would have jurisdiction over the underlying substantive dispute") *citing Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014) (federal courts have jurisdiction over declaratory judgment actions where "a coercive action brought by the declaratory judgment defendant would necessarily present a federal question"). Here, the mass Arbitration Demands assert claims for violation of the Electronic Communications Privacy Act, 18 USC § 2510 *et seq.* ("ECPA"). Pursuant to 28 U.S.C. § 1331, this Court would have original jurisdiction over Claimants' ECPA claims. As to any of the Claimants' other claims, the Court has supplemental jurisdiction over them. *Martinez v. Blu Prods., Inc.,* No. 17-cv-2507, 2019 WL 12817014, at *1 (C.D. Cal. Aug. 19, 2019) (finding court had supplemental jurisdiction over state law claims asserted in connection with ECPA claim).

2. Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)-(2) because: (1) Red Lobster's principal place of business is located in this district; (2) a substantial part of the events or omissions giving rise to the claims occurred in this district; and (3) the Terms and Conditions on Red Lobster's Website have a mandatory forum selection clause specifying that any disputes must be brought in the state or federal courts for Orange County, Florida.

## PARTIES

3. RL Investor Holdings, LLC, is a Delaware limited liability company with its principal place of business in Orlando, Florida.

4. Claimants are 75 individuals who are represented by Bryson Harris Suciu & DeMay PLLC and have filed identical arbitration demands against Red Lobster with AAA alleging that Claimants did not consent to Red Lobster's use of certain alleged tracking technologies which Claimants contend violates the ECPA and CIPA. A full list of the 75 claimants is attached hereto as Exhibit A.

5. Upon information and belief based on information provided to Red Lobster by Claimants' Counsel, 74 of the Claimants are residents of California and 1 Claimant is a resident of Louisiana.

## FACTS

### *Nature of the Action*

6. Claimants and their counsel are trying to weaponize arbitration agreements and negate the underlying purpose and benefits of arbitration—namely, cost effective, expedited resolution of disputes.

7. This weaponization comes in the form of Claimants' counsel filing 75 identical arbitration demands and threatening to file as many as 1,400.

8. The goal of these filings is not to reduce costs; it is to increase them and use the costs as leverage to extort settlement.

9. As an example, each individual Claimant seeks statutory damages of up to $5,000 under CIPA and $10,000 under the ECPA. *See* Cal. Penal Code § 637.2; 18 U.S.C. § 2520(c)(2)(B). But, as detailed below, based just on the *fees* associated with the arbitrations (and not including costs of defense), Red Lobster would be required to pay approximately of $7,300 *per arbitration.* In other words, the cost to Red Lobster for even having the opportunity to defend itself in the arbitration is greater than the cost of simply paying the Claimant the full $5,000 in statutory penalties claimed under CIPA and nearly as much as the statutory penalties claimed under the ECPA. In fact, if Red Lobster were to pay just the fees associated with all of the 1,400 threatened arbitration demands, the cost to Red Lobster would be nearly **$10.25 million,** which does not even take into consideration any award that might be entered in favor of the Claimants, if any.

10. In other words, by weaponizing arbitration, Claimants' counsel has effectively doubled Red Lobster's risk exposure based solely on the fees for arbitration. The goal of these filings is not to reduce costs; it is to increase them and use the costs as leverage.

11. This is precisely why Red Lobster's Arbitration Agreement prohibits mass arbitrations that merely seek to exploit arbitration fees.

12. The mass arbitrations here are especially exploitative considering the specious nature of the claims. These claims are the latest in a trend of lawsuits that California Senator Caballero[1] describes as "abusive shake down lawsuits for standard online business activities" in which "a small number of law firms have filed vexatious lawsuits inappropriately using CIPA's pen-register provision" to extort cost-of-defense settlements. *See* Aug. 3, 2026, Bill Analysis for SB 690, California Assembly Committee on Appropriations (*available at:* *https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202520260SB690#*).

13. Here, Claimants allege that Red Lobster uses certain technologies that track user activity on its Website and share that activity with third parties for analytics and marketing purposes. Claimants allege they did not consent to the use of these technologies, but their theory is undermined by their tactics. Claimants readily admit that they agreed to Red Lobster's Terms & Conditions so they can invoke the Arbitration Agreement. But those Terms & Conditions incorporate Red Lobster's Privacy Notice, where Red Lobster disclosed that it uses the subject technologies and informed users about multiple ways they can limit the information that is shared.

14. Claimants are trying to have their cake and eat it too. Claimants admit they agreed to Red Lobster's Terms & Conditions because they want to use the Arbitration Agreement to exploit arbitration fees. At the same time, Claimants attempt

[1] Senator Cabellero introduced California SB 690 to amend CIPA to eliminate these types of lawsuits. The California Senate passed SB 690 unanimously in June 2025 and SB 690 is currently being debated in the California Assembly. In the version being debated in the California Assembly, SB 690 would include a retroactivity provision that would bar the subject claims.

to deny that they agreed to Red Lobster's use of the exact same technologies that Red Lobster clearly disclosed in its terms.

15. Red Lobster should not be forced to incur millions of dollars in arbitration fees simply to have the opportunity to prove that Claimants' theory is completely undermined by their own tactics and otherwise does not stand on the merits.

*The Cost of Mass Arbitration*

16. AAA designates consumer cases as a "Mass Arbitration" when they involve 25 or more similar demands filed by claimants represented by the same attorneys. *See* AAA Consumer Mass Arbitration and Mediation Fee Schedule, attached hereto as Exhibit B, also available at https://www.adr.org/media/lvgavfty/2026_consumer-mass-arbitration-feeschedule.pdf (last accessed Aug. 25, 2026).

17. In a Mass Arbitration, AAA assesses a series of administrative fees, including an "Initiation Fee," a "Per Case Fee," an "Arbitrator Appointment Fee," and a "Final Fee." (Ex. B). In addition to these fees, AAA's arbitrators are compensated for their time at an hourly rate. (Ex. B).

18. Here, the following table demonstrates how those fees and arbitrator compensation would combine in the case of the 75 cases that Claimants' Counsel has already filed and the 1,400 total claims Claimants' Counsel has threatened to file.

| | **75 Claimants** | **1,400 Claimants** |
|---|---|---|
| Initiation Fee[2] | $8,125 | $8,125 |
| Per Case Fee[3] | $16,250 | $379,375 |
| Arbitrator Appointment Fee[4] | $33,750 | $630,000 |
| Final Fee[5] | $45,000 | $840,000 |
| Arbitrator's Fees[6] | $450,000 | $8,400,000 |
| **Total** | **$553,125** | **$10,257,500** |

19. On a per case basis, a Mass Arbitration here costs more than $7,300 per case. This exceeds the $5,000 statutory damages under CIPA and approaches the $10,000 statutory damages under the ECPA. This case is a perfect example of weaponized arbitration.

*Red Lobster's Privacy Notice Clearly Disclosed it Uses the Alleged Tracking Technologies*

20. Red Lobster operates restaurants across the United States.

21. Red Lobster operates the website located at www.redlobster.com where users can learn about Red Lobster's restaurants and offerings. Users can search for nearby restaurants, make reservations for in-person dining, or place orders for pick up or delivery at certain locations.

22. When a user first visits Red Lobster's Website, the Website displays the following banner at the bottom of the page:

---

[2] The Initiation Fee is a one-time flat fee of $8,125.
[3] The Per Case Fee is $325 per case for the first 500 cases and $250 per case for cases 501 to 1,500. The Initiation Fee is credited against the Per Case Fee.
[44] The Arbitrator Appoint Fee is $450 per case if the parties use the direct appointment method. If the parties use the list and rank process, the fee increases to $600 per case. The table above assumes the less expensive direct appointment method is used. If Claimants insisted on using the list and rank process, that would only increase arbitration fees.
[5] The Final Fee is $600 per case.
[6] AAA distinguishes between Merits Arbitrators that are paid $300 per hour and Process Arbitrators whose rates are determined on an individual basis. The table above applies an even $300 per hour to both merits and process arbitrators and estimates 20 hours of collective arbitrator time per case between merits and process arbitrators.




23. The banner informs users that the Website "uses tracking technologies" and gives the users the option to either "Accept All Cookies," "Reject All Cookies" or "Manage Cookie Preferences" where the user can toggle certain types of technologies on or off. The banner also provides a link to Red Lobster's Privacy Notice that provides additional information.

24. Prior to February 2026, Red Lobster's Website featured a similar banner that appeared as follows:




25. Again, the banner informed users that the Website used cookies to serve personalized ads or content and analyze traffic. The banner gave users the option to either "Accept All" or select "Privacy" where they could manage their preferences and toggle certain types of technologies on or off. The banner also provided a link to Red Lobster's Privacy Notice that provides additional information

26. Hereafter, these banners are referred to as the "Cookie Banner."

27. Users can also use Red Lobster's Website to enroll in Red Lobster's customer rewards program. When a user enrolls in the program on the Website, they use the following form:


RED LOBSTER
FRESH FISH · LIVE LOBSTER
Profile Details
We need you to complete your personal profile to personalize your rewards experience.
First Name *
0 / 30
Last Name *
0 / 30
Phone *
Zip Code *
Birth Month (Optional)
Leave blank or enter 1 to 12
Birth Day (Optional)
Leave blank or enter 1 to 31
By clicking "Enroll Now", you are creating an account and agree to the Terms, Conditions, and Privacy Notice, as well as agree to receive news, offers, and updates via email.
Enroll Now

28. The enrollment form discloses to users that "by clicking 'Enroll Now", you are creating an account and agree to the Terms, Conditions, and Privacy Notice." The text is prominently displayed above the "Enroll Now" button, is clearly contrasted with black text against a white background, and uses the same or larger font size as the rest of the text on the form. Hereafter, this page is referred to as the "Enrollment Form."

29. Red Lobster's Privacy Notice, which has been effective since February 9, 2024, clearly discloses that Red Lobster's Website uses tracking technologies. Specifically, the Privacy Notice discloses the following:

> **Cookies and Other Similar Data Collection Technologies**
>
> Our websites, mobile apps, and other online Services use cookies, pixels, tags, trackers, and similar digital technologies to operate and to help collect data.
>
> - *Cookies* are small text files placed on your device to store data that can be recalled by a web server in the same domain that placed the cookie. The text in a cookie often consists of a string of numbers and letters that uniquely identifies your device, but it can contain other information as well. Cookies on our Services are used, for example, to store your preferences and settings, help authenticate your account and enable you to sign in to our Services, provide interest-based advertising, combat fraud, analyze how our Services perform, personalize your experience and the content you see on

our website (such as by displaying menu items you have viewed or searched for or by conveniently auto-filling data fields in online forms), and fulfill other disclosed or otherwise lawful purposes.

- *Web beacons* (also called single-pixel gifs or clear GIFs) that we use to help deliver cookies on our websites, count users who have visited those websites, and gather usage and performance data. We also include web beacons in our promotional email messages or newsletters to determine whether you open and act on them, and in our ads appearing on other sites to measure the performance of those ads. You may be able to disable web beacons in email messages by changing the settings on your email client to prevent the automatic downloading of images.
- *Software development kits*, or SDKs, which are used to incorporate third-party computer code into our App that allows our service providers and advertising partners to collect personal information from our App for a variety of purposes, including to provide us with analytics regarding the use of our App, to integrate with social media, add features or functionality to our App, or to facilitate online advertising.

Our Websites and Apps often include web beacons, cookies, pixels, tags, trackers, and similar digital technologies from third-party vendors. Sometimes, that is because we have hired the third party to provide

services on our behalf, such as site analytics or advertising. In other cases, it is because our Websites and Apps contain third-party content (such as embedded videos, maps, plug-ins, or ads) that use digital technologies to track the content's operation and performance, as well as your interaction with the content to determine its effectiveness. When your browser connects to a third party's web server to retrieve content and/or web beacons, that third party can set or read its own cookies on your device and may collect information about your online activities over time and across different websites or online services that also have that third party's content or web beacons.

For example, our Websites and Apps use third-party tools (such as Snapchat, AdRoll, Google Analytics, and other Google services), to support the operation and performance of our online Services and to analyze your interactions and experiences with our Services.

You can find out how Google Analytics uses data here and how to opt out of Google Analytics HERE. For more information on how Google uses data when you use our Websites, click HERE. You can learn more about how Facebook uses data HERE. You may be able to opt out of personalized ads from Google by following steps set forth HERE, or from Facebook by following steps set forth HERE.

For more information about the privacy practices of the other third parties, please review their privacy notices. (See Red Lobster's Privacy

Notice, attached hereto as Exhibit C) (also available at https://www.redlobster.com/privacy-policy/ (last accessed on Aug. 25, 2026)).

*Red Lobster Informed Users How they can Limit Data Shared with Third Parties*

30. In addition to opt-out tools provided in Red Lobster's Cookie Banner and the information provided above, Red Lobster's Privacy Notice provided additional information about how users can limit the amount of data that is shared with third parties. The Privacy Notice stated the following:

> **Internet-Based Advertising**
>
> On some pages of our Websites we allow third-party advertising partners to use cookies, web beacons, and other digital technologies to collect or receive information regarding your activities on those Websites (e.g., your IP address, page(s) visited, time of day, and other identifiers). We may also disclose such information we have collected to advertising and analytics companies. These companies may use this information (and combine it with information collected over time and across other websites, apps, or other digital services) to deliver targeted advertisements to you, to provide measurement services when you use our Services, and when you interact with other (non-Red Lobster) websites and online services. This practice is commonly called "interest-based advertising" or "online behavioral advertising." Please refer to

section titled, *How to Exercise Your Privacy Rights* for information on opting out of the use of your data for advertising purposes.

*Industry-wide opt-outs*. Many advertising and analytics providers are members of associations, which provide a way to opt out of analytics and/or ad targeting, which you can access at:

- United States: Network Advertising Initiative and Digital Advertising Alliance
- Canada: Digital Advertising Alliance of Canada

[…]

*Mobile advertising ID controls*. Apple and Android mobile devices each generate an advertising identifier that can be accessed by apps and used by advertisers in much the same way that cookies are used on websites. Each operating system may provide options to limit tracking and/or reset the advertising ID.

*Browser controls*. Web browsers vary on whether they are set to accept or allow various types of cookies and similar digital technologies by default. You can go to your browser settings to learn how to delete or reject cookies. If you choose to delete or reject cookies and similar digital technologies, this could affect our ability to provide certain features or services of our Websites. If you choose to delete digital technologies, settings, and preferences controlled by those digital technologies,

including advertising preferences, may be deleted and may need to be recreated.

*Do Not Track*. Some browsers have incorporated "Do Not Track" ("**DNT"**) features that can send a signal to the websites you visit indicating you do not wish to be tracked. Because there is not a common understanding of how to interpret the DNT signal, our Websites do not currently respond to browser DNT signals. Instead, you can use the range of other tools to control data collection and use, including the cookie controls and advertising controls described above. To find out more about "Do Not Track," you can visit http://www.allaboutdnt.com.

[…]

How to Exercise Your Privacy Rights

*Know/Access, Correction, and Deletion*. You may submit requests to exercise these rights by submitting the form here for each specific request, by contacting us at complianceethics@redlobster.com or by phone at 844-755-3425, ext. 2. We cannot process your request if you do not provide us with sufficient detail to allow us to understand and respond to it.

*Opt out of sale and sharing for targeted advertising.* If you would like to opt out of sale and sharing of personal information other than through cookies or other online tracking technologies, you can do so by filling out the request form here. You can also submit a request to opt-out of sale

> and sharing for targeted advertising through online tracking technologies (such as certain cookies) by clicking the Do Not Sell or Share My Personal Information link in the footer of our Websites and following the steps set forth in the relevant page. Your request to opt out of online tracking technologies will apply only to the browser of the device from which you submit the request. California and Colorado residents may opt out by broadcasting an Opt-Out Preference Signal, such as the Global Privacy Control (GPC) (on the browsers and/or browser extensions that support such a signal). To download and use a browser supporting the GPC browser signal, click here: https://globalprivacycontrol.org/orgs. If you choose to use the GPC signal, you will need to ensure that the browser or browser extension you use supports the GPC signal. (Ex. C).

*Claimants Admit they Agreed to Red Lobster's Privacy Notice and its Use of the Alleged Technologies*

31. Of the 75 Claimants that filed Arbitration Demands, 67 (89%) created rewards accounts with Red Lobster based on email addresses associated with the Claimants that Claimants' Counsel disclosed to Red Lobster. Accordingly, those 67 Claimants affirmatively agreed to Red Lobster's Privacy Notice when they enrolled in their accounts.

32. The remaining Claimants agreed to Red Lobster's Privacy Notice when they continued to use Red Lobster's Website after the Cookie Banner notified them the Website uses the alleged tracking technologies.

33. In either case, Claimants admit that they agreed to Red Lobster's Terms & Conditions by invoking the Arbitration Agreement in the Terms & Conditions. The Terms & Conditions clearly state that "By using the [Website], you acknowledge and accept the [Website's] Privacy Notice available at www.redlobster.com and [...] consent to the collection and use of your data in accordance with the Privacy Notice." (See Red Lobster Terms & Conditions, attached hereto as Exhibit D) (also available at https://www.redlobster.com/terms-conditions/ (last accessed Aug. 25, 2026)).

*Red Lobster's Terms & Conditions Prohibit Mass Arbitrations*

34. Red Lobster's Terms & Conditions state that Florida law governs the Terms & Conditions without regard to conflict of law provisions that would apply other law. (Ex. D; §§ III.C, III.E.3).

35. Red Lobster's Terms & Conditions state that any disputes outside of arbitration "may only be instituted in state or federal court in Orange County, Florida." (Ex. D; §§ III.C, III.D.5).

36. Red Lobster's Terms & Conditions contain dispute resolution procedures that apply to "any controversy, allegation, or claim arises out of or relates to the Service, the Content, your User-Generated Content, these Terms, or any Additional Terms." (Ex. D; §§ III.D.1).

37. The dispute resolution procedures initially require the complaining party to provide notice to the other party of the dispute and allow a 60-day period for informal dispute resolution. (Ex. D; § III.D.1).

38. If a dispute is not resolved during the 60-day period, then the Terms & Conditions require the parties to attempt to resolve the dispute through mediation. (Ex. D; § III.D.2).

39. If a dispute is not resolved through mediation, then "the parties agree to submit the matter for binding arbitration by AAA in accordance with the AAA then-current Consumer Arbitration Rules." (Ex. D; § III.D.2).

40. The Terms & Conditions contain the Arbitration Agreement. Some of the relevant provisions for purposes of this Complaint are the following.

41. "You and we will pay the arbitration administrative and arbitrator's fees and other costs in accordance with the applicable arbitration rules; but if applicable arbitration rules or laws require Red Lobster to pay a greater portion or all of such fees and costs in order for this Section III(D) to be enforceable, then Red Lobster will have the right to elect to pay the fees and costs and proceed to arbitration." (Ex. D; § III.D.2.ii).

42. "To the extent permitted by applicable law, disputes will be arbitrated only on an individual basis and will not be joined or consolidated with any other arbitrations or other proceedings that involve any claim or controversy of any other party." (Ex. D; § III.D.4). "But if, for any reason, any court with competent jurisdiction holds that this restriction is unconscionable or unenforceable, then our agreement in Section III(D)(2) to arbitrate will not apply and the Dispute must be brought exclusively in court pursuant to Section III(D)(5)." (Ex. D; § III.D.4).

43. "Any and all issues relating to the scope, interpretation and enforceability of this Section III(D)(4), including the class action waiver provisions contained herein, are to be decided only by a court of competent jurisdiction, and not by the arbitrator." (Ex. D; § III.D.4).

44. "Except to the extent that arbitration is required in Section III(D)(2), and except as to the enforcement of any arbitration decision or award, any action or proceeding relating to any Dispute may only be instituted in state or federal court in Orlando, Orange County, Florida. Accordingly, you and Red Lobster consent to the exclusive personal jurisdiction and venue of such courts for such matter." (Ex. D; § III.D.5).

*Claimants' Mass Arbitration Tactics*

45. On February 16, 2026, Claimants' Counsel began issuing dispute notices alleging that they did not consent to Red Lobster's use of certain tracking technologies. Claimants' Counsel claimed it represented a group of 1,400 clients and provided a list of those 1,400 Claimants to Red Lobster. A representative copy of Claimants' pre-dispute notices is attached hereto as Exhibit E.

46. On June 16, 2026, Claimants' Counsel filed formal demands for arbitration with AAA on behalf of 75 Claimants. Aside from listing a different Claimant, the Arbitration Demands are identical. A representative copy of Claimants' Arbitration Demands is attached hereto as Exhibit F.

47. None of the Arbitration Demands specify when the Claimants accessed the Website or what actions they took on the Website. (Ex. F). Rather, the Arbitration

Demands generically allege that Claimants "visited Respondent's website, and provided Respondent with PII and SPI." (Ex. F). The Arbitration Demands did not define "PII" or "SPI." (Ex. F).

48. The Arbitration Demands alleged that Claimants did not consent to Red Lobster's use of certain tracking technologies and asserted claims under the ECPA, CIPA and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"). Despite the clear language in Red Lobster's Cookie Banner and Privacy Notice, the Arbitration Demands alleged that "[a]t no time during Claimant's interaction with [Red Lobster's] Website was Claimant informed of […] the use of tracking technology through any clear or conspicuous disclosure." (Ex. F). "[Red Lobster's] Terms and Conditions failed to disclose the use of this invasive tracking technology, leaving users unaware of how their data was being collected, processed, or shared." (Ex. F).

49. Despite their denials that Red Lobster's Cookie Banner and Privacy Notice clearly disclosed the use of the alleged tracking technologies, Claimants' Arbitration Demands readily admit that Red Lobster's "Terms and Conditions govern the use of the [W]ebsite" and contain an Arbitration Agreement. (Ex. F).

50. On July 27, 2026, AAA sent to Red Lobster an invoice for $8,425 encompassing Red Lobster's "Initiation Fee" and "Expedited Clause Review Fee" for Claimants' Arbitration Demands. AAA's invoice becomes due on August 26, 2026.

51. On August 11, 2026, Red Lobster and Claimants' Counsel participated in a mediation. Despite good faith negotiations, the parties did not reach a settlement.

Prior to and during the mediation, Red Lobster advised Claimants' Counsel that the Arbitration Agreement prohibited mass arbitration and did not apply to Claimants' consolidated claims.

52. Red Lobster anticipates Claimants' Counsel will file motions to compel arbitration.

## THE APPLICABLE LAW

53. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999).

54. "In determining whether the parties agreed to arbitrate a particular dispute, courts consider: (1) whether there is a valid agreement to arbitrate; and (2) whether the dispute in question falls within the scope of that agreement." *Patriot Mfg. v. Dixon*, 399 F. Supp. 2d 1298, 1301 (S.D. Ala. 2005).

55. Claimants admit they entered into Arbitration Agreements with Red Lobster.

56. Red Lobster denies that the mass arbitration in question falls within the scope of that agreement for several reasons.

57. First, the Arbitration Agreement states that "disputes will be arbitrated only on an individual basis and will not be joined or consolidated with any other arbitrations or other proceedings that involve any claim or controversy of any other party." (Ex. D; § III.D.4). Here, Claimants joined or consolidated their disputes by simultaneously filing 75 identical Arbitration Demands through the same counsel.

Claimants' Counsel has threatened to file as many as 1,400 such arbitration demands. The Arbitration Agreement prohibits the joinder or consolidation of claims and therefore the subject mass arbitration are not within the scope of the parties' Arbitration Agreement.

58. Second, the section of the Arbitration Agreement prohibiting the joinder or consolidation of claims states that " if, for any reason, any court with competent jurisdiction holds that this restriction is unconscionable or unenforceable, then our agreement in Section III(D)(2) to arbitrate will not apply and the Dispute must be brought exclusively in court pursuant to Section III(D)(5)." (Ex. D; § III.D.4). Here, to the extent the Court finds that the Arbitration Agreement's prohibition of mass arbitration is unconscionable or unenforceable, then the Arbitration Agreement does not apply.

59. Third, the Arbitration Agreement states that "you and we will pay the arbitration administrative and arbitrator's fees and other costs in accordance with the applicable arbitration rules; but if applicable arbitration rules or laws require Red Lobster to pay a greater portion or all of such fees and costs in order for this Section III(D) to be enforceable, then Red Lobster will have the right to elect to pay the fees and costs and proceed to arbitration." (Ex. D; § III.D.2.ii). This provision gives Red Lobster the option to refuse to arbitrate any claims where the applicable rules require Red Lobster to pay a greater portion of the fees. Here, AAA's rules would require Red Lobster to pay a greater portion of, and indeed the vast majority of, AAA's fees. Accordingly, even if this mass arbitration could be within the scope of the Arbitration

Agreement, Red Lobster exercises its option to decline arbitration and require litigation in court.

## CAUSE OF ACTION

### COUNT I – DECLARATORY JUDGMENT OF NON-ARBITRABILITY

60. Red Lobster realleges the foregoing paragraphs as if fully set forth herein.

61. Claimants, through their previously-filed 75 Arbitration Demands and Claimants' Counsel's threat to file as many as 1,400 such demands, have engaged in and continue to engage in weaponized mass arbitration tactics in hopes of exploiting arbitration fees to extort a settlement.

62. As explained above, the mass arbitration demands are not within the scope of the Arbitration Agreement.

63. Even if the mass arbitration demands could be considered within the scope of the Arbitration Agreement, Red Lobster exercises its right to decline arbitration of any dispute that requires Red Lobster to pay a greater portion of the arbitration fees.

64. As a result of Claimants' mass arbitration tactics and the fees associated with such tactics, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

65. A judicial declaration is necessary and appropriate so that Red Lobster may ascertain its legal obligations vis-à-vis Claimants' Arbitration Demands.

66. Additionally, Red Lobster seeks injunctive and equitable relief as is necessary to protect Red Lobster from any steps taken by Claimants while this action

is pending to either (1) advance their arbitration demands or (2) compel their claims to arbitration.

## PRAYER FOR RELIEF

RL INVESTOR HOLDINGS, LLC prays for the following relief:

1. A declaratory judgment that the Arbitration Demands are not within the scope of the Parties' Arbitration Agreements;
2. Preliminary and permanent injunctive relief that (a) restrains all Claimants and their representatives, agents, and all persons or entities acting in concert with them during the pendency of this action and thereafter perpetually from seeking to compel Red Lobster to arbitrate the Arbitration Demands or the substance thereof; and
3. Any other relief that the Court deems just and appropriate.

Dated: August 26, 2026

Respectfully submitted,

**WILSON ELSER MOSKOWITZ EDELMAN& DICKER LLP**

By: *s/ Jura C. Zibas*

Jura C. Zibas
Florida Bar No: 124571
2063 Main Street - Suite 100
Sarasota, FL 34237
Telephone: 941-866-8561
Facsimile: 941-210-5979
Jura.Zibas@wilsonelser.com
Cheryl.Kujawski@wilsonelser.com

Brian H. Myers* (*pro hac vice* application forthcoming)
1500 K Street NW, Suite 330

Washington, DC 20005
Telephone: 202-626-7695
Facsimile: 202-628-3606
Brian.Myers@wilsonelser.com

*Counsel for Plaintiff*
*RL Investor Holdings, LLC*